STATE of Texas and City
of Austin, Appellants,

v.

MUNDAY ENTERPRISES, Texas Commerce Bank–Austin, N.A. and First City National Bank of Austin, f/k/a City National Bank of Austin, Appellees.

No. 3–90–236–CV.

Court of Appeals of Texas,
Austin.

Jan. 15, 1992.

Rehearing Overruled March 11, 1992.

Iris J. Jones, City Atty., John J. Greene, Asst. City Atty., Austin, for appellants.

John McClish, Womack & McClish, P.C., Austin, for appellees.

Before CARROLL, C.J., and ABOUSSIE and KIDD, JJ.

KIDD, Justice.

Appellants, the State of Texas and City of Austin (collectively, the "State"), appeal from a jury verdict and trial-court judg-

ment in favor of appellee, Munday Enterprises ("Munday").[1]

## THE CONTROVERSY

This is another in a series of condemnation actions by the State to obtain property for the widening of U.S. Highway 183 within the city limits of Austin, Texas. This condemnation proceeding concerned a 1.65–acre taking out of a 15.84–acre tract owned by condemnee, Munday. The project in question involves the conversion of U.S. Highway 183 to a controlled-access highway. To eliminate grade crossings, the State intends to raise the main traffic lanes in front of Munday's property some thirty-seven feet in the air. These elevated lanes will connect at intervals to entrance and exit ramps. These ramps will connect in turn to parallel three-lane frontage roads. After completion of the project, Munday's property will adjoin one of the frontage roads. On the new freeway system, motor vehicles on the main traffic lanes will have only indirect access, by way of the frontage roads and ramps, to and from Munday's property.

The condemned property in question is an automobile dealership with several buildings and paved parking areas. Munday contends that immediately prior to the condemnation action, the property in question was one of the finest automobile dealership locations in the City of Austin. Munday alleges that because of the taking, which actually included some buildings and which moved the right-of-way line unacceptably close to other buildings, the existing car dealership could no longer continue to operate. Munday ultimately contends that due to the nature of the new freeway, the remainder property will no longer be adaptable to automobile dealership use and, therefore, the remainder property, following the condemnation project, will be damaged and its fair market value reduced.

To prove these contentions at trial, the condemnees offered substantial documentary evidence including a three-dimensional model of the property before and after the taking, numerous photographs and plats of the property, maps and drawings of the proposed freeway facility, and photographs showing construction activities similar to those to be undertaken within the part of the property actually condemned. Munday produced testimony from a land planner experienced in the planning and constructing of automobile dealerships; three former high-ranking General Motors executives, who among them had some fifty years of experience in selecting sites for automobile dealerships; two real estate appraisal witnesses with a total of more than sixty years of experience and extensive backgrounds in appraising automobile dealerships for acquisition and development; and the landowner, Bill Munday.

The condemnee's evidence was premised on the fact that the remainder property, following this condemnation action, would be less valuable than before because it would be damaged for its use as an automobile dealership site. In sum, Munday's witnesses testified that a willing buyer would not pay a willing seller as much money for the Munday tract following the completed freeway project. To justify their opinion of the diminution in value of the remainder property, Munday's experts testified that use of the remainder property as an automobile dealership would suffer because: (1) raising the main traffic lanes and constructing U.S. Highway 183 as a controlled-access freeway would result in more difficult access for prospective customers to reach the automobile dealership; (2) elevating the main traffic lanes would reduce the automobile dealership's visibility from those lanes, which is an important element in any commercial undertaking and especially new or used automobile sales; and (3) construction activities on the project would interfere with use of the tract during highway construction, which the undisputed testimony indicated would be over a lengthy period of years; all of which would

1. Two lien holders were also noticed on the original petition in this cause and the objection to the Special Commission award; Texas Commerce Bank–Austin, N.A. and First City National Bank of Austin, f/k/a City National Bank of Austin. Their names, however, do not appear in the appellate briefs as parties of record.

make the property less desirable to a willing buyer.

The State argued in the trial court below, and contends in its points of error on appeal, that all of this testimony from Munday's expert witnesses was inadmissible and injected non-compensable elements of damage into this condemnation proceeding. The State contends that, since these elements of damages are non-compensable, the trial court erred in not instructing the jury that they could not consider these damage elements for any purpose. Furthermore, the State contends that the damages to the remainder property are the same as those suffered by the community in general and are therefore non-recoverable. The State's experts testified that the remainder property could be redeveloped as an automobile dealership, and that Munday's remaining land would not be affected at all by the condemnation or construction project.

The trial court submitted the entire cause, which was tried on the sole issue of damages, in a single jury question which required the jury to find the difference between the fair market value of the entire Munday property before the condemnation as contrasted with the value of the remainder property afterwards, considering the effect of the condemnation on the value of the remainder property. *See* Tex.Prop. Code Ann. § 21.042(c) (1984). The State assigns error in this broad-form submission.

There were also significant pretrial discovery disputes between the parties. Indeed, at one point the trial court entered an order striking all experts for both sides. When the original trial was postponed and reset for June 1990, the trial court, after motion and hearing, allowed both sides to supplement their discovery responses and to present their expert witnesses at the time of trial. The State assigns this action of the trial court as error.

## DISCUSSION AND HOLDING

The Texas Const. art. I, § 17 provides as follows:

No person's property shall be taken, damaged or destroyed for or applied to the public use, without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall first be made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities, shall be made; but all privileges and franchises granted by the Legislature, or created under its authority shall be subject to the control thereof.

The Texas Property Code provides that in the assessment of damages the special commissioners (and trial jury) may consider the following:

(b) If an entire tract or parcel of real property is condemned, the damage to the property owner is the local market value of the property at the time of the special commissioners' hearing.

(c) If a portion of a tract or parcel of real property is condemned, the special commissioners shall determine the damage to the property owner after estimating the extent of the injury and benefit to the property owner, including the effect of the condemnation on the value of the property owner's remaining property.

Tex.Prop.Code Ann. § 21.042(b), (c) (1984).

Texas is one of only twenty-six states that provides by its constitution, as well as by statute, that the landowner is entitled to recover not only the value of the portion of the land that is actually taken, but also any damage or destruction that is done to the remaining property as a result of the condemnation project. *See* F. Russell Kendall, *Special and Community Damages—A Confusion in Definition,* 10 Hous.L.Rev. 282 (1973). This damage to the remainder property is the issue in this cause. In the landmark case of *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194 (1936), the Texas Supreme Court set out the evidentiary rules for establishing the damages recoverable by a landowner in a condemnation case. The *Carpenter* court determined that the ultimate question was one of market value and the depreciation, if any, in

the market value of the remainder property as a result of the condemnation action. The Court defined market value in terms of what the property would bring in a transaction between a willing seller and willing buyer. *Carpenter,* 89 S.W.2d at 201–02; *see also City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808, 812 (1954). Following *Carpenter* and *Cannizzo,* the Texas Supreme Court has repeatedly and specifically acknowledged the "willing-seller/willing-buyer" test of market value in partial taking cases. *See Spindor v. Lo-Vaca Gathering Co.,* 529 S.W.2d 63 (Tex. 1975); *State v. Walker,* 441 S.W.2d 168 (Tex.1969).

### Evidence of Non–Compensable Damages

In points of error two and three, the State argues that the jury's verdict is not supported by admissible evidence because the trial court erred in allowing Munday's witnesses to testify to non-compensable elements of damage in arriving at their opinions regarding the diminution in value of the remainder tract. In points of error four, five, six, and seven, the State argues that the court improperly failed to instruct the jury that they could not consider non-compensable elements of damage and failed to instruct the jury that community damages were not recoverable. Finally, in its eighth point of error, the State contends that the trial court erred in denying its motion for mistrial because of Munday's reliance upon non-compensable elements of damage.

■ At the outset, we should note that Munday's witnesses did not introduce the disputed evidence on the theory that these damages were recoverable as *separate damage elements,* but instead as justification for their opinion that the value of the remainder tract had been damaged and its market value reduced. In addition, the trial court gave a limiting instruction to the jury in the court's charge as follows:

You are instructed that you may consider the evidence you have heard relating to such matters as access, visibility, and the construction project to the extent that you believe that such factors may affect

the FAIR MARKET VALUE of the remaining property as of August 30, 1989, if at all, and only to that extent. Such evidence is not to be considered as showing separate elements of damage independent of the FAIR MARKET VALUE of the remainder.

The evidentiary rules as set out in *Carpenter,* and *City of Pearland v. Alexander,* 483 S.W.2d 244 (Tex.1972), substantiate that Munday's evidence was admissible for consideration by the trier of fact as bearing upon the question of damage to the remainder property. In *Alexander,* the Texas Supreme Court held:

[W]here a part of a tract of land has been taken for a public use, damages to the remainder tract are to be determined by ascertaining the difference between its market value immediately before and after the appropriation, taking into consideration the nature of the improvement, the use to which the land taken is to be put, and all circumstances which tend to increase or diminish the present market value. The recovery is for damages which reasonably could have been foreseen and determined at the time of the condemnation. (Citation omitted.) *The willing-seller/willing-buyer test of market value is to be applied and those factors are to be considered which would reasonably be given weight in negotiations between a seller and a buyer.* (Citation omitted.)

483 S.W.2d at 247 (emphasis added). Therefore, we hold that the evidence introduced by Munday's expert witnesses, which established the diminution in value of the remainder property as a result of the willing-buyer/willing-seller fair market value test, was admissible under the decisions of the Texas Supreme Court.

■ The State argues that the trial-court judgment must be set aside because it is based upon non-compensable condemnation elements of damage such as Munday's loss of access, visibility, and inconvenience as a result of freeway construction. This Court has specifically rejected this contention in *State v. Schmidt,* 805 S.W.2d 25 (Tex.App. 1991, writ granted), and in an unpublished

opinion, *State of Texas and City of Austin v. Austex, Ltd.,* No. 3–90–172–CV (Tex. App.—Austin, June 12, 1991, writ granted). We continue to adhere to these holdings. To do otherwise would result in Munday's property being taken without just compensation in violation of article I, § 17 of the Texas Constitution and Section 21.042(c) of the Tex.Prop.Code Ann. (1984). Access rights are valuable rights which must be considered in determining the fair market value of Munday's remainder property. *See* William Stoebuck, *The Property Right of Access Versus the Power of Eminent Domain,* 47 Tex.L.Rev. 733 (1969); Madison Rayburn, *Legal Rights and Legal Fictions in Condemnation,* 10 Hous.L.Rev. 251 (1973).[2] In addition, we note that there is further statutory authority for allowing Munday's experts to introduce evidence regarding loss of access rights. Article 1085a of the Revised Civil Statutes regarding the subject of freeways provides:

> Section 1. The State Highway Commission or the governing body of any incorporated city or town, within their respective jurisdictions may do any and all things necessary to lay out, acquire, construct, maintain and operate any section or portion of any State highway or city street as a freeway, and to make any highway or street within their respective jurisdictions a freeway, *except that no existing State highway or city street shall be converted into a freeway except with the consent of the owners of abutting lands; or by the purchase or condemnation of their right of access thereto,* providing, however, nothing herein shall be construed as requiring the consent of the owners of abutting lands where a State highway, or city street is constructed, established or located for the first time as a new way for the use of vehicular and pedestrian traffic.

Tex.Rev.Civ.Stat.Ann. art. 1085a (1963) (emphasis added).

The State relies upon a number of cases that, *in the abstract,* seem to buttress its contention that rights to access and visibility as well as construction inconvenience are not compensable in condemnation actions. These cases can be classified generally in one of two categories which render them distinguishable from the present cause: (1) inverse condemnation cases; and (2) cases where the condemnee seeks to recover damage elements *in addition to* fair market value damages.

In the first category of cases cited by the State, *e.g., City of Austin v. Avenue Corp.,* 704 S.W.2d 11 (Tex.1986), *City of Houston v. Fox,* 444 S.W.2d 591 (Tex.1969), and the other pure inverse-condemnation cases, the real issue addressed by the Texas Supreme Court is not the nature of the evidence to be admitted on the amount of damages but rather, whether the condemnor is liable for a taking *at all* under the provisions of art. I, § 17 of the Texas Constitution. In the second category of cases the State cites, statutory condemnation proceedings, the landowners attempted to recover lost profits due to damages to their on-going businesses *in addition to* recovery for the fair market value of the land taken and for remainder damages. *See, e.g., State v. Wood Oil Distrib., Inc.,* 751 S.W.2d 863 (Tex.1988); *State v. Sungrowth VI, California Ltd.,* 713 S.W.2d 175 (Tex. App.1986, writ ref'd n.r.e.); *State v. Lock,*

---

**2.** After considering Texas Supreme Court opinions such as *Carpenter, Cannizzo, Alexander* and others, Rayburn declared:

> These opinions, generation after generation, have shown that in condemnation cases we are dealing with elements of value and elements of damage and that any fact (yes, even circuity of travel to and from property) that makes the remaining land less valuable, or any fact that benefits or makes it more valuable, is and should be admissible on trial. . . .
>
> So long as we continue to measure the damages or value of remainder land by its before and after market value, by the willing seller-willing buyer concept, which is purely an economic one, then it is inescapable that good access or bad access, a high or low traffic count, a good central location or a poor inaccessible location, utilities or no utilities, corner or no corner, one-way or two-way traffic, and no access or impaired access have been and always will be economic factors that a buyer or seller will take into monetary account when they go into the market place to buy or sell. Location is the keystone and soul of the economics of market value of lands that are the subject of property ownership.

Rayburn, *supra* at 259.

468 S.W.2d 560 (Tex.Civ.App.1971, writ ref'd n.r.e.). In such cases, the landowners are also obliged to prove inverse condemnation as the predicate for recovering damages outside the statutory test of fair market value. *Sungrowth VI,* 713 S.W.2d at 177. All of these cases are inapplicable to the case at bar and we do not find them persuasive.

Thus, based upon the established holdings of *Carpenter, Cannizzo, Alexander,* and others, as well as sound constitutional and statutory principles, we hold that Munday established by admissible and competent testimony a diminution in the fair market value of his remainder property for which he was entitled to be compensated. The State's points of error two, three, five, six, seven, and eight are overruled.

### *Community Damages*

■ In its fourth point of error, the State contends that the trial court erred in not giving a limiting instruction to the jury on community damages. In conjunction with this point of error, the State cites well-established eminent-domain law for the proposition that the jury in estimating injury or benefit to the remainder property "may not consider an injury or benefit that the property owner experiences in *common* with the *general community.*" Tex.Prop. Code Ann. § 21.042(d) (1984) (emphasis added). However, the State's argument in this regard is premised upon a basic misconception. The State would have us define "general community" as all of Munday's neighboring condemnee-landowners along U.S. Highway 183. The State takes the position in its brief that Munday has not met his burden of proof because he has not shown that his remainder damages are any different "than all other property on State Highway 183" and, therefore, the State argues Munday's damages are not compensable. We reject this construction of the term "general community damages."

The Texas Supreme Court in *City of Fort Worth v. Corbin,* 504 S.W.2d 828, 831 (Tex.1974), stated: "[t]he objective of the judicial process under the constitution and statutes is to make the landowner whole and to award him only what he could have obtained for his land in a free market." Were we to adopt the State's definition of the term "community damages," no landowner who suffered the same type of remainder damages as his neighboring condemnees would be entitled to the compensation guaranteed him by the Texas Constitution and Statutes. We hold that the term "general community" means the community *at large* and is not limited to other condemnee-landowners of the project in issue. *See Haynes v. City of Abilene,* 659 S.W.2d 638, 641 (Tex.1983). We reject the State's narrow definition of the term "community damages."

We are aware of the holding in *Olson v. Harris County,* 807 S.W.2d 594 (Tex.App. 1990, writ denied), which arguably conflicts with some aspects of our holding in the instant cause. However, we believe that a close reading of *Olson* shows it is in harmony with the principles which we have espoused.

*Olson* was a partial taking case. The landowner's remainder property in *Olson* fronted on an elevated freeway. Olson's complaint was that an "extraordinarily high and steep" ramp was directly in front of his remainder property and "he thought there was a danger of flying debris from the ramp." *Olson,* 807 S.W.2d at 595–96. He also complained of increased traffic noise from the ramp. The opinion does not reveal any testimony that Olson's concerns diminished the fair market value of his remainder property. To the contrary, an independent appraiser testifying for the condemnors, stated that the value of Olson's remainder property was actually enhanced by the project. That appraiser demonstrated with comparable sales that remainder properties along the freeway were actually worth more as a result of the project.

*Olson* was a non-jury trial before the court. At the conclusion of all the evidence, the trial court held that the landowner was not entitled to remainder damages because his damages were those shared by the "general community" and thus were non-compensable. The appellate

court upheld the trial court's judgment and the supreme court denied application for writ of error.

In harmonizing *Olson* with the opinion we have expressed herein, several observations are in order:

1. The trial court in *Olson* held all the evidence to be admissible, which is in conformity with the actions of the trial court in the instant case and contrary to the State's argument.

2. In *Olson* there appears to be no testimony from the landowner-witnesses that the dust, noise, and traffic hazards had any effect upon the fair market value of his remainder property. In the instant case, there is substantial, and in many instances, uncontroverted evidence that the fair market value of the Munday remainder property was significantly impaired and diminished.

3. The court in *Olson* observes that much of the landowner's concern, especially that regarding the danger of flying objects, was speculative. On the other hand, there is ample evidence in this record that Munday's damages are not speculative.

4. *Olson* reached the appellate court upon a record of negative findings by the trier of fact whereas in the instant case we are asked to review evidence which resulted in a favorable jury verdict. The court in *Olson* comments that the burden of establishing remainder damages rests with the landowner and that Olson simply had not carried his burden of proof.

5. Finally, a careful reading of *Olson* indicates that the holding of the court of appeals is a very *narrow* one. After observing that it is up to the trial court to hear and weigh all of the evidence and the testimony of the witnesses, that court states: "We hold that the trial court did

not err in concluding that damages shared by the community were not compensable as a matter of law." *Olson*, 807 S.W.2d at 596. Certainly, this Court does not disagree with that statement of condemnation law.

In the final analysis, in harmonizing *Olson* with our present opinion, we believe that there were significant procedural and factual differences, both in the nature of the legal theories and the quantum of the testimony, which resulted in a different appellate conclusion in *Olson* from the one that we reach here. However, to the extent that *Olson* can be read to conflict with our holding, we decline to follow it.

Therefore, we conclude that Munday's remainder damages were not "general community damages" and the trial court did not err in the instructions given and refused in conjunction with the charge. The State's fourth point of error is overruled.

## Court's Charge

■ The trial court submitted this condemnation case upon a single broad-form damage issue which required the jury to find the difference in value between the Munday tract as it existed before the condemnation project was initiated, and the Munday remainder property after the condemnation, taking into account the effects of the project itself.[3]

The State complains in its first point of error that the trial court submitted an improper jury question. Munday responds that the court's charge followed the most recent and authoritative law on the subject. *See Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73 (Tex.1988). The Texas Supreme Court therein stated that in condemnation cases, the following should be observed:

The measure of damages in a condemnation proceeding is the difference in mar-

---

3. The jury issue actually submitted was:

QUESTION

Find the DIFFERENCE between the FAIR MARKET VALUE of:

(a) The entire Munday Enterprises tract of land, as improved, without any reference to or consideration of the taking or proposed project; and,

(b) The remainder property, after condemnation of the land and improvements taken, considering the effects of the condemnation on the value of the remaining property.

ANSWER IN DOLLARS: $_____

ket value of the land immediately before and immediately after the taking. *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex.1972). Future condemnation cases should be submitted broadly in terms of the difference in value rather than asking separate questions on pre- and post-taking values.

*Id.* at 76.

Even though the State concedes that the charge was in compliance with the *Callejo* decision, it seeks to distinguish *Callejo* upon the basis that *Callejo* was an easement taking as contrasted with a partial taking in fee. Such a distinction is of no consequence and the trial court properly rejected it.

The State preferred a single special issue that would have required the jury to find compensation in a two-step process by adding together the value of the part taken and the decrease, if any, in the before and after value of the remainder property. While there are certain circumstances where such a two-step process might be required, as for example where the landowner does not want enhancement of the remainder property offset against the value of the part of the property taken in condemnation, this case did not present such an unusual circumstance to require deviation from the approved charge set out in *Callejo*.

■ Further, Munday contends that the State has waived any error by not properly objecting to the sole issue as submitted. We agree. Objection is the proper method of preserving complaint as to an issue actually submitted but claimed to be defective, regardless of whether the issue is one relied upon by the complaining party or his opponent. *Vela v. Alice Specialty Co.*, 607 S.W.2d 289, 291 (Tex.Civ.App.1980, no writ). Texas Rules of Civil Procedure, Rule 274, provides: "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." Tex.R.Civ.P.Ann. 274 (Supp. 1991). We have searched the record and cannot find where the State ever objected to the question as submitted. While it is true that the State tendered its own requested issue, this does not preserve *by objection* its point of error. We conclude that the point has been waived.

■ However, even had the point not been waived, it is difficult to see how the State has been harmed. In contrasting the two submissions, that of the trial court as given and that of the State as requested, it is difficult to understand the State's contention that a jury would reach a different result in either instance. A jury's damage award which finds the difference between Munday's entire tract before the condemnation as contrasted with the value of the remainder tract after the condemnation should be identically the same monetary award as the jury determining separately the value of the part taken, and then the decrease of the value in the remainder property before and after the condemnation. Therefore, we hold that even if the State properly preserved its objection, the State would be unable to show harm by the submission in question. The State's point of error one is accordingly overruled.

*Discovery Dispute*

In its ninth and final point of error, the State argues that all of the expert testimony Munday presented should have been struck for failure to verify supplemental interrogatory answers. The State's point is without merit.

■ During pretrial discovery, Munday timely filed *unverified* supplemental answers to certain interrogatories. Later, within thirty days of the date set for trial, Munday filed the same supplemental answers but this time with the proper verification. At a pretrial hearing, the trial court struck Munday's expert witnesses because of his failure to properly verify the supplemental answers within thirty days of trial and also struck the State's expert witnesses because of other unrelated discovery disputes. On the original trial date, the case was not reached and the trial was continued for several months. Munday then filed with the trial court a motion to reconsider the court's earlier ruling regarding the striking of expert witnesses. After

notice and hearing, the trial court entered an order permitting both sides to present expert witnesses at the time of the postponed trial.[4] The State attacks this action of the trial court on the basis that there was no justifiable "good cause" shown as required by the rules. Tex.R.Civ.P.Ann. 215(5) (Supp.1991). The State maintains that although the trial court's order was more than thirty days before the postponed trial setting, the court had no discretion to reconsider the earlier order to strike expert witnesses. We disagree.

Discovery sanctions pursuant to Rule 215(5) are within the sound discretion of the trial judge, subject only to the requirement that the sanctions be *just. Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991). In *Powell,* the Texas Supreme Court observed that sanctions are a matter within the sound discretion of the trial court and should be exercised so that discovery-abuse punishment would "fit the crime." *Id.* at 917. In the instant cause, the State raises a technical violation of the discovery rules as a result of Munday's failure to verify the first set of supplemental interrogatories filed. This violation was later corrected. The trial court, after notice and hearing, concluded that the trial should proceed with both parties' experts testifying. The test to be applied by this Court is whether this action by the trial judge constitutes a clear abuse of discretion.

In a recent opinion, an appellate court held that verification of supplemental answers to written interrogatories is unnecessary if the original answers are properly verified. *Jones v. Kinder,* 807 S.W.2d 868 (Tex.App.1991, no writ). In the wake of *Powell* and *Kinder,* we hold that the trial court in this cause exercised sound discretion in the manner in which it handled the pretrial discovery disputes. *Cf. Service Lloyds Ins. Co. v. Harbison,* 826 S.W.2d 930 (Tex.1991) (where a trial court, after a hearing on objections to an expert witness interrogatory then ordered answers to be filed, answers were timely despite the fact that they were filed only seventeen days

before trial). We refuse to overturn a jury verdict and trial-court judgment on a highly technical verification error, one of form and not of substance. The State's point of error nine is overruled.

Having concluded that there was no error in the trial below, we affirm the judgment of the trial court.

## ON MOTION FOR REHEARING

On motion for rehearing, the State argues that our original opinion erred in holding the Munday was entitled to introduce evidence at trial on loss of access, visibility, and highway construction activity, not as separate elements of damage, but as affecting the value of the remainder tract. In support of its motion, the State relies primarily on *State v. Baker Bros. Nursery,* 366 S.W.2d 212 (Tex.1963), and *State v. Wood Oil Distrib., Inc.,* 751 S.W.2d 863 (Tex.1988). Because we believe that neither case controls and that each is distinguishable, we will overrule this motion for rehearing.

*Baker Bros. Nursery* concerned a condemnation suit brought by the State of Texas to condemn 12.246 acres of land out of a twenty-eight acre tract located within the city limits of Fort Worth, Texas. The condemned property was to be used for the construction of a controlled-access highway, leaving the Baker Bros. Nursery on a one-way frontage road after the project's completion. Prior to trial, the State moved to suppress any reference regarding the direction of traffic flow on the proposed limited-access highway and frontage road or "evidence of any circuity of travel occasioned by such highway." *Baker Bros. Nursery,* 366 S.W.2d at 214. The trial court granted the motion to suppress evidence, the court of appeals reversed, and the State sought review in the Texas Supreme Court. Relying on *Pennysavers Oil Co. v. State,* 334 S.W.2d 546 (Tex.Civ.App. 1960, writ ref'd), the Supreme Court reversed the court of appeals holding that the motion to suppress evidence was proper

---

**4.** The entry of this order was more than thirty     days in advance of the new trial setting.

because the landowners' remainder property continued to have some access to the new highway by means of a frontage road. *Baker Bros. Nursery*, 366 S.W.2d at 214.

The distinguishing features in *Baker Bros. Nursery*, that prevent it from controlling the instant case are two-fold. First, the Texas Supreme Court in *Baker Bros. Nursery* relied primarily on *Pennysavers*. *Pennysavers* was a condemnation case wherein the landowner sought to recoup *lost business profits* as a separate element of damages resulting from the project in question. *Pennysavers* reached the appellate court upon a negative jury finding which refused to award any damages to the landowner. The *Pennysavers* court considered this finding important and held that "[t]he jury correctly found, in effect, that the State had not damaged Appellant by taking from it an access easement that it never had." 334 S.W.2d at 549. Therefore, the Texas Supreme Court's opinion in *Baker Bros. Nursery* was premised upon a condemnation case wherein the landowner was seeking lost business profits and failed to obtain a favorable jury finding on the issue of damages. *Baker Bros. Nursery* and *Pennysavers* are markedly different from the present case in which Munday did obtain a favorable jury finding on diminution of the fair market value of the remainder property and was not seeking damages for loss of business profits.

Secondly, in *Baker Bros. Nursery*, as is noted in the court of appeal's opinion, the landowner was permitted to introduce evidence of the depreciation in market value of the remainder property even though the trial court had granted the motion to suppress evidence. In commenting upon that assignment of error, the court of appeals stated:

As a matter of fact the evidence placed before the jury did demonstrate all material facts concerning the accessibility of the property remaining in the condemnee after condemnation and after the completion of the highway facility, as such *might have bearing upon the increase or decrease in the value of condemnee's remaining property.* Therefore, we do not believe any prejudice was occasioned. *Baker Bros. Nursery v. State*, 357 S.W.2d 163, 167 (Tex.Civ.App.1962) (emphasis added) *rev'd on other grounds*, 366 S.W.2d 212 (Tex.1963). At trial, therefore, the landowner in *Baker Bros. Nursery* was allowed not only to introduce evidence but also to seek recovery for the possible diminution in value of the remainder property. Our original opinion provides Munday with no more extensive relief in the present case.

Likewise, in *Wood Oil Distrib.*, the trial court had granted the State's motion in limine prohibiting the landowner from questioning witnesses with regard to travel diversion or circuity of travel. 751 S.W.2d at 865. The court of appeals reversed the trial court's decision in this regard, but the Texas Supreme Court once again reversed and upheld the trial court, holding as follows:

It is well settled that damages to *a condemnee's business* which result merely from traffic being required to travel a more circuitous route to reach a condemnee's property are not compensable. *City of San Antonio v. Olivares*, 505 S.W.2d 526, 529 (Tex.1974); *City of Houston v. Fox*, 444 S.W.2d 591, 593 (Tex.1969); *City of Waco v. Texland Corp.*, 446 S.W.2d 1, 2 (Tex.1969); *City of Beaumont v. Marks*, 443 S.W.2d 253, 257 (Tex.1969).

*Id.* (emphasis added). It is significant that the cases relied upon in *Wood Oil Distrib.* (i.e., *Olivares, Fox, Texland Corp.* and *Marks*) were all inverse condemnation cases wherein the landowner was seeking damages absent any physical taking of real property. In addition, in *Wood Oil Distrib.*, just as in *Baker Bros. Nursery*, the court of appeals commented that the landowner was allowed, at trial, to examine witnesses and put on evidence regarding the diminished value of the remainder tract.

*Baker Bros. Nursery* and *Wood Oil* are premised upon either inverse condemnation cases or cases wherein the landowner sought independent damages for loss of

business profits. Further, in each case the landowner was ultimately permitted to introduce evidence on the diminished value of the remainder property as a result of the loss of access rights. For these reasons, we do not regard either case as controlling. Therefore, the State's motion for rehearing is overruled.